**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

**DAUNTA L. D. WILLIAMS,**

     **Plaintiff,**

**vs.**                  **Case No.  1:17cv48-MW/CAS**

**NANCY A. BERRYHILL, Acting**
**Commissioner of the Social Security**
**Administration,[1]**

     **Defendant.**
_____/

## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United

States Magistrate Judge for a report and recommendation pursuant to 28

U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court

pursuant to 42 U.S.C. § 405(g) for review of the final determination of the

Acting Commissioner (Commissioner) of the Social Security Administration

(SSA) denying Plaintiff's Title XVI application for Supplemental Security

Income (SSI).  After careful consideration of the entire record, it is

respectfully recommended that the decision of the Commissioner be

affirmed.

_____

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of
Social Security.

## I. Procedural History and Facts

Plaintiff filed an application for Supplemental Security Income (SSI) on June 25, 2013, alleging a disability beginning on November 1, 2011. Tr. 168-73.[2]  The application was denied initially, Tr. 108, and again on reconsideration.  Tr. 114.  A hearing was requested and held on May 13, 2015, before an administrative law judge (ALJ), at which Plaintiff was represented by attorney Pamela Dunmore.  Tr. 29-72.  At the hearing, Plaintiff amended his alleged onset of disability date to November 20, 2012. Tr. 33.

On September 9, 2015, a decision was entered denying Plaintiff's application.  Tr. 11-23.  Plaintiff sought review in the Appeals Council, which denied review on December 29, 2016.  Tr. 1-4.  Thus, the decision of the ALJ became the final decision of the Acting Commissioner and is ripe for review.  Accordingly, Plaintiff, represented by counsel, filed this complaint for judicial review pursuant to 42 U.S.C. §§ 1381, *et seq.,* and 42 U.S.C. § 405(g).  *See* ECF No. 1.

---

[2] Citations to the transcript/administrative record (ECF Nos. 10, 10-1 through 10-16) shall be by the symbol "Tr." followed by a page number that appears in the lower right corner of each page.

## II. Findings of the ALJ

In the decision issued on September 9, 2015, the ALJ made findings

pertinent to this review:

1. "**The claimant has not engaged in substantial gainful activity since June 25, 2013, the application date (20 CFR 416.971 *et seq.*).**" Tr. 13.

2. "**The claimant has the following severe impairments: systemic lupus erythematosus, history of seizure disorder, asthma (20 CFR 416.920(c)).**" Tr. 13. The ALJ found that the claimant's medically determinable mental impairments of mild neurocognitive disorder and adjustment disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are thus nonsevere. Tr. 13.

3. "**The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).**" Tr. 15.

4. "**After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except with no more than occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps, stairs, ladders, ropes, and scaffolds. The claimant must avoid concentrated exposure to dusts, fumes, odors, gases, and poor ventilation. The claimant must avoid even moderate exposure to hazards such as unprotected heights and dangerous machinery.**" Tr. 15.

5. "**The claimant has no past relevant work (20 CFR 416.965).**" Tr. 21.

6. "**The claimant was . . . 18 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).**" Tr. 21.

7. "**The claimant has a limited education and is able to communicate in English (20 CFR 415.964).**" Tr. 21.

8. "**Transferability of job skills is not an issue because claimant does not have past relevant work (20 CFR 416.968).**" Tr. 21.

9. "**Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).**" Tr. 21. The ALJ concluded, based on the vocational expert's testimony, that Plaintiff can perform representative jobs such as office helper (DOT # 239.567-010) light, unskilled work, SVP 2 with 43,000 nationwide positions; mail clerk (DOT # 209.687-026) light, unskilled work, SVP 2 with 35,000 nationwide positions; cashier II (DOT # 211.462-010) light, unskilled work, SVP 2 185,000 nationwide positions; and document preparer, microfilming (DOT # 249.587-018) light, unskilled work, SVP 2 with 45,000 nationwide positions. The ALJ concluded that a finding of "not disabled" was appropriate. Tr. 22.

10. "**The claimant has not been under a disability, as defined in the Social Security Act, since June 25, 2013, the date the application was filed (20 CFR 416.920(g)).**" Tr. 22.

Plaintiff's application for supplemental security income filed on June 25, 2013, was denied based on the ALJ's finding that he is not under a disability and is thus ineligible for SSI benefits under § 1614(a)(3)(A) of the Social Security Act.[3] Tr. 22.

---

[3] Section 1614(a)(3)(A) of the Social Security Act is codified at 42 U.S.C. § 1382. *See* Higginbotham v. Barnhart, 163 F. App'x 279, 280 n.1 (5th Cir. 2006).

Plaintiff contends that the decision is not supported by substantial evidence and, in finding that there was work in the national economy that Plaintiff could perform, the ALJ failed to consider Dr. Martinko's evidence that Plaintiff's abilities vary depending on whether he is having joint pain and how recently he has had a medication infusion. ECF No. 20 at 22. Plaintiff argues that the ALJ ignored Dr. Martinko's opinion that, although Plaintiff's pain varies with time, his ability to function in a regular workplace environment and his ability to perform at a consistent pace without an unreasonable number and length of rest periods are seriously limited. *Id.* at 22-23. Plaintiff argues that although the ALJ recognized his history of migraines and sensitivity to light during a headache, the ALJ failed to include any loss of work time on a regular basis resulting from these impairments. *Id.* at 23-24. Plaintiff also takes issue with the ALJ's conclusion that although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements about the intensity, persistence, and limiting effect of the symptoms are not entirely credible. Tr. 17. Plaintiff contends that substantial medical evidence of Dr. Martinko supports Plaintiff's testimony about the chronicity and level of his pain and his migraine headaches. ECF No. 20 at 28.

The Acting Commissioner counters that the ALJ properly considered the relevant evidence in assessing Plaintiff's RFC and in evaluating Plaintiff's subjective statements concerning his disabling conditions. ECF No. 21 at 6. The Acting Commissioner contends that the ALJ properly relied on the opinion of the state agency consultant, Dr. Nicolas Bancks, who opined that Plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand/walk/sit for six hours in an eight-hour workday, and perform other actions, with limitations, consistent with the RFC found by the ALJ. The Acting Commissioner also contends that Dr. Bancks' opinion is not inconsistent with Plaintiff's medical history of routine conservative treatment, adequate response to treatment with compliance, and clinical observations, or with results of physical examinations that failed to identify more substantial limitations. ECF No. 20 at 7.

## III. Relevant Medical and Other Evidence

### A. Hearing testimony

Plaintiff testified at the May 13, 2015, hearing before the ALJ. Tr. 33-67. He was age 18 at the time of his application. Tr. 33. He lives with his mother and his siblings and has never worked. He did not graduate from high school due to his frequent hospital visits due to lupus and seizures in 2013. Tr. 35. Plaintiff testified that he cannot work because he gets tired

very easily and has seizures and joint pain caused by his lupus. Tr. 36. He testified that he has not had a seizure for almost a year and that he has had four seizures between November 2012 and May 2015. Tr. 37-38. After a seizure, he has a migraine that can last all day. Tr. 38. He is taking medication for his seizures. Tr. 40. He was diagnosed with lupus, he believed, in 2011, and receives infusion medication for that condition. Tr. 41-42. He has also been prescribed CellCept for his lupus. Tr. 42. Plaintiff testified the lupus causes him to have drowsiness, joint pain, and stomach pain. *Id.*

Plaintiff testified that when he was diagnosed, he was in high school and was on the football team and the basketball team. He said that he "participated, but [he] didn't play," although he was diagnosed with knee pain in 2012 from playing basketball. Tr. 43. Plaintiff testified that he also has asthma and takes Albuterol as needed. Tr. 45.

When asked what limitations keep him from working, he identified fatigue and intermittent seizures. Tr. 46. He said he can lift but not continually, and has a bad shoulder from a sprain in 2011. *Id.* He said he has no problems sitting or standing but has constant stomach pain and

chest pain.[4]  Tr. 47-48.  He was given a stress test to check his chest pain

in 2011 but was not given any follow-up treatment.  T. 48-49.  He has knee

pain if he bends or turns in a certain way or if he walks too long.  Tr. 49.

His ACL was reconstructed in 2011, but has had no treatment for knee pain

since that time.  Tr. 50.

Plaintiff has been seeing his treating physician, Dr. Thomas Martinko

at Shands.  Tr. 52.  Plaintiff testified that he has arm and leg joint pain

every day, and it occurs mostly when he is getting out of bed.  Tr. 54.  He is

often drowsy and will sleep four to five hours a day.  Tr. 55.  Plaintiff has

also had a rash on his abdominal area and sores in his mouth which come

and go but are very painful.  Tr. 56.  His last mouth sores were about two

months before the hearing.  Tr. 57.  In 2012, his doctor recommended he

be homeschooled and he did that for a short time.  Tr. 55, 58.  He resumed

going to school on campus until he stopped about three months before

graduation.  Tr. 58-59, 34.  Plaintiff testified that he has migraine

---

[4] Plaintiff's counsel interjected and explained that the chest pain was not considered to be cardiac-related but was the result of musculoskeletal problems caused by lupus; and that Plaintiff has what is called "shrinking lung syndrome" which usually presents with chest pain.  Tr. 50.  "Shrinking lung syndrome" is described as a rare complication of systemic lupus erythematosus (SLE) characterized as unexplained shortness of breath, a restrictive pattern on function tests, and an elevated hemidiaphragm.  R. Singh, W. Huang, Y. Menon, L.R. Espinosa, "Shrinking lung syndrome in systemic lupus erythematosus and Sjogren's syndrome."  *See* https://www.ncbi.nlm.nih.gov/pubmed/17041405.

headaches about once a week and they last at least two hours.  Tr. 60.

During a migraine, he has sensitivity to light.  *Id.*  When a migraine occurs,

he must lie down and sleep in the hopes that when he wakes it will be

gone.  *Id.*

Plaintiff testified that he has experienced depression and tried to

commit suicide in 2014.  Tr. 60-61.  He saw someone for his depression for

just over three months in 2014, but has not been treated since.  Tr. 61-63.

Plaintiff said he is taking medication prescribed by his rheumatologist

Dr. Melissa Elder for depression.  Tr. 63.

Plaintiff described his daily routine as doing "nothing at all."  Tr. 64.

He said after he tries to "clean up" his room, wash dishes, and take out the

trash, he then sits down for the rest of the day to watch television.  *Id.* He

testified that he tries to play basketball about once a week for 30 minutes to

one hour with friends in the neighborhood.  Tr. 65.  His mother does the

shopping.  Tr. 66.  Plaintiff has a driver's license but only drives to go to the

doctor.  *Id.*  He has no problem taking care of his personal needs.  *Id.*

Paul Dolan, a vocational expert, testified.  Tr. 67.  He was presented

with a hypothetical question in which the person of the same age and

education as Plaintiff is limited to performing work at a light exertional level,

and who can only occasionally balance, stoop, kneel, crouch, crawl, and

climb stairs, ramps, ladders, ropes, and scaffolding.  Tr. 68.  The

hypothetical proposed that the person would have to avoid concentrated

exposure to dust, fumes, odors, gasses, and poor ventilation, and even

moderate exposure to hazards such as unprotected heights and dangerous

machinery.  *Id.*  When asked if such a person could perform any work, the

vocational expert testified that such a person could perform the jobs of

office helper, DOT # 239.567-010,[5] SVP of 2, unskilled, light exertional

level with approximately 43,000 jobs in the national economy; mail clerk,

DOT # 209.687-026, SVP of 2, unskilled, light exertional level, with

approximately 35,000 jobs in the national economy; cashier II, DOT #

211.462-010, SVP of 2, unskilled, light exertional level, with approximately

185,000 jobs in the national economy; and document preparer,

microfilming, DOT # 249.587-018, SVP of 2, unskilled, light exertional level,

with approximately 45,000 jobs in the national economy.  Tr. 68-69.

In a second hypothetical question, the ALJ asked the vocational

expert to also assume that the person was further limited to performing only

jobs that required simple, routine, repetitive tasks with simple instructions

---

[5] The Dictionary of Occupational Titles is a publication produced by the United States Department of Labor that defines over thirteen thousand different types of work. *See* Dictionary of Occupational Titles (DOT), U.S. Dep't of Labor, Employment and Training Administration, Fourth Ed. Revised 1991; 20 C.F.R. 416.966(d) (including the DOT as an example of reliable job information of which the Social Security Administration will take administrative notice).

and involving simple work-related decisions with few changes in routine. Tr. 69. The vocational expert testified that these additional limitations would not change his testimony concerning jobs that the person could perform. *Id.*

In a third hypothetical, the ALJ asked the vocational expert to also assume that due to a combination of symptoms from impairment, including fatigue, pain, and malaise, the person would likely be unable to maintain concentration, persistence, and pace, and would be off task at least 25% or more during the work day, or unable to maintain regular attendance, or absent at least four or more days per month. Tr. 69-70. The vocational expert was asked if that person be able to perform any work. *Id.* The vocational expert testified that with those additional limitations, the person could not perform any work. Tr. 70.

At the conclusion of the hearing, the ALJ asked Plaintiff's counsel to update the records from Shands Hospital including any mental health counseling records.[6] Tr. 71.

---

[6] The ALJ asked counsel why the records concerning treatment for depression were not in the file and counsel responded that she would follow up with Shands to obtain those records. Tr. 62. The record was left open for 20 days after the hearing but no mental health treatment records for the 2014 treatment were provided to the ALJ. Tr. 14.

**B. Medical Evidence.**[7]

Plaintiff injured his knee causing a lateral meniscus tear and

meniscoscapular separation on the medial side playing sports in 2010.

Tr. 310.  After he underwent reconstruction knee surgery, recuperation was

successful and Plaintiff was cleared for straight ahead running in May

2011.  Tr. 299.  Plaintiff was seen in July 2011 at University of Florida

Physicians[8] for shoulder pain and was diagnosed with shoulder pain

resulting from playing football.  Tr. 294, 296-97.  Progress notes also

indicated a history of asthma, febrile seizure, migraines, depression, and

attention deficit hyperactivity disorder.  Tr. 295.  Progress notes from

August 2011 indicate that the shoulder sprain was doing well and Plaintiff

was about to start playing football and was given clearance to do so by the

physician.  Tr. 290, 292.  Plaintiff was seen at University of Florida

Physicians for recurring flank and abdominal pain in October 2011.

Tr. 670.  In his November 2011 follow-up visit, Plaintiff reported no further

---

[7] This recitation of portions of the medical evidence is based on the Court's independent review of the record.  The synopsis of medical evidence will be supplemented as necessary in the Analysis section.

[8] Over several years, Plaintiff saw many different physicians at University of Florida and University of Florida Physicians, including at UF pediatric specialty clinics, pediatric immunology/rheumatology division, orthopaedic and sports medicine institute, UF Health Pediatrics-Schiebler CMS Center, and the congenital heart center, as well as at Shands Hospital.

flank or abdominal pain. Tr. 669. A December 2011 follow-up to his knee surgery reported that Plaintiff had no complaints and was playing football and basketball with no instability. Tr. 288.

In January 2012, Plaintiff returned to the University of Florida Physicians with knee pain after a fall playing basketball. Tr. 284. At that time, Plaintiff reported no recent chest pain, shortness of breath, or abdominal pain. Tr. 286. In April of 2012, Plaintiff returned with complaints of knee pain after injury playing basketball. Tr. 280. He also reported hand pain at that time due to a finger injury while playing football the prior August. Tr. 283, 278.

Plaintiff was diagnosed with systemic lupus erythematosus in early 2012. Tr. 596, 652. Dr. Diego Moguillansky of the University of Florida Congenital Heart Center, saw Plaintiff on May 4, 2012, and noted that Plaintiff was had been placed on CellCept but had problems with chest pain and palpitations. Tr. 595-99. Dr. Moguillansky noted that on that date, Plaintiff had no current manifestations of lupus apart from some ongoing fatigue, but that he was active in basketball and football and performs without difficulty. Tr. 596. The notes indicate Plaintiff denied joint pain. *Id.* Plaintiff was cleared for physical activity without any limitations. Tr. 599.

Plaintiff was referred to the University of Florida Department of Pediatrics Division of Immunology and Rheumatology and saw Dr. Melissa Elder on June 19, 2012. Tr. 778. The progress notes indicate that Plaintiff had started on CellCept, but had stopped taking it. *Id.* The notes indicated he had agreed to restart CellCept and Plaquenil and that he reported "he is better with resolution of his fatigue, headaches. Morning stiffness and LBP are much improved." *Id.* The notes further stated that he was planning on attending summer school and playing football and basketball. *Id.*

In a June 12, 2012, visit to University of Florida Physicians, Plaintiff reported no joint pain or swelling. Tr. 595. Cardiac evaluation showed no heart abnormality and Plaintiff was again cleared for sports. Tr. 594. Plaintiff was seen at University of Florida Physicians on September 17, 2012, after a concussion received several weeks earlier while playing football. Tr. 322. Progress notes indicate that when he received the concussion, he lost consciousness for a short time and later collapsed and was in and out of consciousness for 20 to 30 minutes. Tr. 324. He was taken to the emergency department and was given a CT scan that was normal and he was discharged without further intervention. Tr. 322. Plaintiff did report headaches, dizziness, and photophobia at the time. Tr. 324. The progress notes for September 17, 2012, indicate no reported

post-concussive headaches, memory loss, or fatigue or other post-concussive symptoms.  Tr. 322.  He was cleared to resume playing football.  *Id.*

On September 20, 2012, Dr. Elder saw Plaintiff and reported that he had been noncompliant with his CellCept medication, but had been taking the medication since the June 2012 visit and was doing well as far as his lupus was concerned  Tr. 773.  Physical examination disclosed normal chest sounds with no cough or wheezes, full range of motion of all joints, normal strength and sensation and no rash.  Tr. 775.  His CellCept medication was increased in dosage.  Tr. 777.  Progress notes from University of Florida Physicians in October 2012 indicate that Plaintiff was still playing football in October 2012 but reported he did not have the endurance he once had.  *Id.*  The notes indicate that Plaintiff has had "an occasional headache."  *Id.*  Plaintiff discontinued his CellCept due to chest pain, shortness of breath, and syncope.  Tr. 596.

Plaintiff saw University of Florida Physicians in January 2013 and reported a mild concussion received while playing basketball.  Tr. 624. Plaintiff was cleared to play.  Tr. 627.  Progress notes for an April 2013 visit to Dr. Thomas Martinko at University of Florida Physicians for a follow-up to reported seizures indicated that Plaintiff had some seizures when he was

very young but had not had any for a long time. Tr. 620. Plaintiff
experienced seizures after having the second concussion while playing
basketball. *Id.*

In June 2013, Dr. Elder saw Plaintiff at Shands at University of
Florida. Tr. 764. The hospital admission diagnosis was lupus, seizures,
and migraines. He was discharged as stable. *Id.* It was again reported
that he was noncompliant with his CellCept medication and medical
appointments and that he refused his medication. Tr. 764-65. The notes
indicate he agreed to take the CellCept after his discharge. Tr. 765. The
notes also indicate he is not allowed to drive for six months as per Florida
law. *Id.*

On July 10, 2013, Plaintiff received a neuropsychological assessment
at the University of Florida College of Public Health and Health Psychology
clinic. Tr. 811-25. During that assessment, medical records were noted
that Plaintiff was prescribed CellCept but self-discontinued the medication
and was subsequently started on quarterly Rituximab infusions. Tr. 812.
Plaintiff reported during that assessment that his lupus did not significantly
affect his daily functioning, noting only some throat soreness and stiffness
in the morning. *Id.* Plaintiff was diagnosed with mild neurocognitive
disorder due to traumatic brain injury and adjustment disorder with mixed

disturbance of emotions conduct. Tr. 824. Contributory diagnoses were systemic lupus erythematosus, seizure disorder, and concussion. *Id.*

On September 3, 2013, Plaintiff was seen at University of Florida Physicians for a recheck of his lupus. Tr. 611. He presented that day with chest pain and gum pain. *Id.* Plaintiff reported experiencing chest pain for several weeks. Tr. 611. He reported no recent seizures. Tr. 612. A spirometry was performed to test lung function but the test result was normal. Tr. 615.

Dr. Elder's notes from a September 13, 2013, visit at the University of Florida Physicians indicate that Plaintiff was supposed to be on CellCept and rituximab because Benlysta was considered contraindicated due to reports of Plaintiff's significant depression. Tr. 757. The progress notes state that rituximab was started in February 2013 and his serologies and platelet count had improved as a result. *Id.* Plaintiff was returning for rituximab, which was one month overdue. *Id.* Plaintiff reported increased joint pain and stiffness, myalgias, headaches, and fatigue. *Id.* The notes state, "Because of his seizures, he cannot do sports so he has no plans to enroll in college or get a job. He is not doing anything." *Id.* The progress notes indicate "occasional abdominal pain" and reports of depression. Tr. 759. Dr. Elder indicated that he would be referred to psychiatry for

evaluation and management of his depression and mood changes.

Tr. 763.

Nicolas Bancks, M.D., a state agency medical consultant who

reviewed the medical evidence in the record, opined on September 27,

2013, that Plaintiff had two severe impairments—systemic lupus

erythematosus and migraine—and one non severe impairment—affective

disorder. Tr. 95. He concluded that Plaintiff had no restriction of activities

of daily living or limitation on maintaining social functioning. Tr. 96. He

opined Plaintiff has mild difficulty in maintaining concentration, persistence,

or pace. *Id.* Dr. Bancks noted that on reconsideration, Plaintiff did not

report any worsening or new mental limitations and no new mental

conditions. *Id.* Dr. Bancks concluded that the severity of the reported

symptoms and the alleged effect on function are not entirely consistent with

the total medical and non-medical evidence. Tr. 97. Dr. Bancks assessed

a residual functional capacity to include certain stated exertional limitations,

as required by Plaintiff's lupus, asthma, seizures and occasional

migraines.[9] Tr. 98. Based on the records reviewed, Dr. Bancks opined

---

[9] The limitations include occasionally lift or carry 20 pounds; stand and/or walk for a total of about six hours in a workday, with normal breaks; sit for a total of about six hours in a workday, with normal breaks; occasionally climb ramps or stairs, ladders/ropes/scaffolds; balance, kneel, crouch or crawl occasionally; and environmental limitations. Tr. 98-99.

that Plaintiff was not disabled and could perform work at a light exertional level.  Tr. 100.

On November 25, 2014, Plaintiff saw Dr. Elder, whose notes indicate that Plaintiff had been recently followed by a counselor to discuss depression and aggression.  Tr. 792.  Plaintiff was not working or in school.  Tr. 793.  He was diagnosed with fatigue, chest pain, well-controlled asthma, headaches, history of seizures, and depression.  Tr. 795-96.  The notes state he was positive for joint pain, swelling, stiffness, muscle pain and weakness, but also stated that Plaintiff had a full range of motion in all joints without pain.  Tr. 796.  Assessment notes state that Plaintiff's depression has been mildly improving with counseling and medications, "although we have again encouraged Daunta to get involved in something outside the home to give him something to look forward to; we have encouraged him to sign up for some college courses and/or apply for a part time job.  We have contacted Tara Lavan, from social work, to assist in the process of connecting him with resources and/or possible vocational education in the future."  Tr. 799.  The notes state that Plaintiff's seizures remain well-controlled per patient report, on Vimprat."  *Id.*

On May 2, 2015, Dr. Martinko provided a Lupus Medical Source Statement in which he stated that Plaintiff fulfills the diagnostic criteria for

systemic lupus erythematosus as identified by the American College of Rheumatology and is also diagnosed with depression, rash, oral ulcers, photosensitivity, and several other conditions. Tr. 801. The statement also noted that Plaintiff has central nervous system involvement as shown by seizures. *Id.* Dr. Martinko stated that Plaintiff also has severe fatigue and inflammatory arthritis. Tr. 802. In a Residual Functional Capacity Evaluation by Treating Physician form of that same date, Dr. Martinko stated that he could not answer the questions on the form because Plaintiff's abilities vary according to when he is having joint pain and how recently he had an infusion of his medication. Tr. 805. The RFC evaluation form also stated that the recurrent abdominal pain would impact Plaintiff's job abilities. Tr. 805. In the Clinical Assessment of Pain by Treating Physician form, Dr. Martinko stated that Plaintiff had repeatedly reported pain, that a patient with Plaintiff's diagnosis would experience pain, that the pain is somatogenic rather than psychogenic, caused by damage to body tissue rather than neuropathic, and recurrent. Tr. 806-07. Dr. Martinko also indicated on this form that Plaintiff's pain could vary from mild to moderate to marked depending on the day and if he is experiencing a flare-up. Tr. 809. Dr. Martinko opined that Plaintiff's degree of restriction would be moderate (defined there as severely limited), but varies with time.

*Id.* Finally, Dr. Martinko concluded that Plaintiff's restriction on his ability to maintain attention and concentration was mild; restriction on his ability to perform activities on a schedule with regular attendance within customary tolerances was marked; restriction on his ability to complete a normal workday and workweek without interruption from pain and to perform without an unreasonable number and length of rest periods was moderate, and restriction on his ability to interact appropriately with the public was mild.  Tr. 810.  Dr. Martinko noted that Plaintiff cannot drive so it is not easy for him to travel to and from work.  *Id.*

## IV. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002)

(citations omitted).[10]  The Court may not decide the facts anew, reweigh the

evidence, or substitute its judgment for that of the Commissioner,

Bloodsworth, 703 F.2d at 1239, although the Court must scrutinize the

entire record, consider evidence detracting from the evidence on which the

Commissioner relied, and determine the reasonableness of the factual

findings.  Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992); Parker v.

Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986).  Review is deferential, but

the reviewing court conducts what has been referred to as "an independent

review of the record."  Flynn v. Heckler, 768 F.2d 1273, 1273 (11th Cir.

1985).

A disability is defined as a physical or mental impairment of such

severity that the claimant is not only unable to do past relevant work, "but

cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national

---

[10]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not

less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 416.909

(duration requirement).  Both the "impairment" and the "inability" must be

expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212

(2002).  In addition, an individual is entitled to disability insurance benefits if

he or she is under a disability prior to the expiration of her insured status.

*See* 42 U.S.C. § 423(a)(1)(A); Moore, 405 F.3d at 1211; Torres v. Sec'y of

Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz

Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps, pursuant to 20

C.F.R. § 416.920(a)(4)(i)-(v):

> 1.  Is the individual currently engaged in substantial gainful
> activity?
>
> 2.  Does the individual have any severe impairments?
>
> 3.  Does the individual have any severe impairments that meet
> or equal those listed in Appendix 1 of 20 C.F.R. Part 404,
> Subpart P?

   4.  Does the individual have the residual functional capacity (RFC) to perform work despite limitations and are there any impairments which prevent past relevant work?[11]

   5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work available

---

[11] Residual functional capacity is the most a claimant can still do despite limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of his or her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id*.  The responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term *"residual functional capacity assessment"* describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

in significant numbers in the national economy in light of the claimant's RFC, age, education, and work experience. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1228-29 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that he is disabled and, consequently, is responsible for producing evidence in support of his claim. *See* 20 C.F.R. § 416.912(a); Moore, 405 F.3d at 1211. The responsibility of weighing the medical evidence and resolving any conflicts in the record rests with the ALJ. *See* Battle v. Astrue, 243 F. App'x 514, 523 (11th Cir. 2007) (unpublished).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to

the medical evidence that cannot be obtained from the objective medical

findings alone or from reports of individual examinations, such as

consultative examinations or brief hospitalizations." 20 C.F.R.

§ 416.927(c)(2).[12] "This requires a relationship of both duration and

frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating

physician must be supported by substantial evidence, Marbury v. Sullivan,

957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.

Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is

given to a treating physician's opinion and any reason for giving it no

weight, and failure to do so is reversible error." MacGregor, 786 F.2d at

1053.

The ALJ may discount the treating physician's opinion if good cause

exists to do so. Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986).

Good cause may be found when the opinion is "not bolstered by the

evidence," the evidence "supported a contrary finding," the opinion is

"conclusory or inconsistent with [the treating physician's] own medical

records," the statement "contains no [supporting] clinical data or

---

[12] This provision applies to claims filed before March 27, 2017. For claims filed after that date, section 416.920c, "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017," applies.

information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence or is wholly conclusory."  Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

Some opinions on issues such as whether the claimant is unable to work, the claimant's RFC, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of the case; *i.e.*, that would direct the determination or decision of disability."  20 C.F.R. § 416.927(d); *see* Bell v. Bowen, 796 F.2d 1350, 1353-54 (11th Cir. 1986).  "[T]reating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance."  SSR 96-5p, 1996 SSR LEXIS 2, at *6 (1996).  Although physicians' opinions about what a claimant can still do or the claimant's restrictions are relevant evidence, such opinions are not determinative

because the ALJ has responsibility of assessing the claimant's RFC. A treating physician's opinion that a claimant is unable to work and is necessarily disabled would not be entitled to any special weight or deference. The regulations expressly exclude such a disability opinion from the definition of a medical opinion because it is an issue reserved to the Commissioner and a medical source is not given "any special significance" with respect to issues reserved to the Commissioner, such as disability. 20 C.F.R. § 416.927(d)(1), (3); SSR 96-5p, 1996 SSR LEXIS 2, at *6. In Lewis, the court noted "that we are concerned here with the doctors' evaluations of [the claimant's] condition and the medical consequences thereof, not their opinion of the legal consequences of his condition. Our focus is on the objective medical findings made by each doctor and their analysis based on those medical findings." 125 F.3d at 1440.

Generally, more weight is given to the opinion of a specialist "about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(c)(2), (5)[13]; *see also* Benecke v. Barnhart, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (noting that "[s]pecialized knowledge may be particularly important with respect to a

---

[13] *See* note 12, *supra*.

disease such as fibromyalgia that is poorly understood within much of the medical community," thus rheumatologists' opinions were entitled to greater weight than those of other physicians) (Benecke quoted in Somogy v. Comm'r of Soc. Sec., 366 F. App'x 56, 65 n.13 (11th Cir. 2010) (unpublished)). Although a claimant may provide a statement containing a treating physician's opinion of her remaining capabilities, the ALJ must evaluate such a statement in light of the other evidence presented and the ALJ must make the ultimate determination of disability. 20 C.F.R. §§ 416.912, 416.913, 416.927, 416.945.

## V. Analysis

Plaintiff contends that substantial evidence does not support the ALJ's findings of fact or the ALJ's resolution of mixed questions of law and fact. ECF No. 20 at 11-12. Plaintiff cites Dr. Martinko's responses to a questionnaire regarding Plaintiff's residual functional capacity assessment in which Dr. Martinko stated that he could not answer the questions because Plaintiff's abilities vary according to whether he was having joint pain and how recently he had received an infusion, and that the recurrent abdominal pain would affect his abilities. ECF No. 20 at 22 (citing Tr. 803-05). Dr. Martinko did not elaborate on how often Plaintiff's variable joint pain or abdominal pain would affect his abilities. Plaintiff also cites

Dr. Martinko's statement on the clinical assessment of pain form that Plaintiff's pain was variable, from mild to marked, depending on the day and whether his disease has flared. ECF No. 20 at 22 (citing Tr. 809). Dr. Martinko stated on the form that Plaintiff's pain varies but could seriously limit Plaintiff's ability to perform in a work environment eight hours a day, five days a week, with regular breaks.  Plaintiff contends that this statement, and the combined effect of Plaintiff's other impairments, is proof that Plaintiff cannot be present and work in the workplace eight hours a day, five days a week, with normal breaks.  ECF No. 20 at 23.

The ALJ found that Plaintiff does have the following severe impairments: systemic lupus erythematosus, history of seizure disorder, and asthma.  Tr. 13.  The ALJ acknowledged that the Plaintiff has work-related limitations associated with his severe impairments that restrict him to light work, with postural and environmental limitations, and incorporated restrictions reflecting those limitations in the RFC.  Tr. 15-17.  The ALJ noted that although Dr. Martinko indicated he could not answer the questions in the residual functional capacity evaluation, he referred the reader to the November 2014 rheumatology records.  The ALJ found that those records reflect normal physical examination results and indicate that Plaintiff's lupus was well-controlled with treatment.  The ALJ also noted that

those records cited by Dr. Martinko encouraged Plaintiff to enroll in college or seek employment, which suggests an ability to perform some level of work activity.  Tr. 20.

The rheumatology records from Plaintiff's November 25, 2014, visit to the Pediatric Immunology/Rheumatology clinic at the University of Florida support the ALJ's finding that the rheumatology specialist found his lupus was "stable and well-controlled" and that Plaintiff was encouraged to sign up for college courses or find part time employment.  Tr. 799.  The notes indicate that Plaintiff was referred to Tara Lavan from social work to assist in connecting him to resources and possible vocational education.  *Id.* There is nothing in the record to indicate that Plaintiff followed up on the referral to the social worker or possible vocational education.  The notes from November 25, 2014, also indicate that Plaintiff's seizures remain well controlled.  *Id.*

The ALJ concluded that Dr. Martinko's 2015 report of the level of Plaintiff's limitation due to pain was an overestimation because it was not supported by objective findings, treatment records, and Plaintiff's capacities as demonstrated in his daily activities.  Tr. 20-21.  The ALJ also noted that there was no record of Dr. Martinko's treatment or medical following of Plaintiff since September 2013.

Plaintiff testified that he experienced joint pain in the morning.  Tr. 54.
He testified that after he tries to "clean up" his room, wash dishes, and take
out the trash, he then sits down for the rest of the day to watch television.
*Id*.  He testified that he tries to play basketball about once a week for 30
minutes to one hour with friends in the neighborhood.  Tr. 65.  He has no
problem taking care of his personal needs.  Tr. 66.  The ALJ found, based
on the totality of the medical evidence and Plaintiff's activities of daily living
that Plaintiff can sustain a greater capacity for work than was alleged and
that his subjective complaints and alleged limitations are not fully
persuasive.  Substantial evidence in the record bears out this finding.

Plaintiff alleged his disability began in November 2012.  Progress
notes from October 2012 indicate Plaintiff was still playing football and had
an occasional headache.  Tr. 317.  When Plaintiff saw Dr. Elder in
September 2012, it was reported that he had been noncompliant on taking
his CellCept.  Tr. 773.

In January 2013, Plaintiff was playing basketball and suffered a
concussion.  Tr. 624.  In July 2013, in a neuropsychological assessment,
Plaintiff reported that his lupus did not significantly affect his daily
functioning, mentioning only some throat soreness and stiffness in the
morning.  Tr. 812.  The report states that Plaintiff expressed a hope to

attend college on a basketball scholarship but was concerned that playing basketball could be risky considering his seizure history.  Tr. 813-14.

In June 2013, it was again reported that he was noncompliant with his CellCept medication.[14]  Tr. 764-65.  Plaintiff reported increased joint pain, headaches, and fatigue.  Tr. 757.  At that time, he reported his abdominal pain as "occasional."  *Id.*  In November 2014, Dr. Elder reported that plaintiff reported joint pain and stiffness, but exhibited a full range of motion.  Tr. 796.  Plaintiff's seizures remained well-controlled.  Tr. 799.  At that visit, Plaintiff was encouraged to attend school of obtain some sort of employment.  *Id.*  Dr. Nicolas Bancks, the state agency medical consultant, opined that Plaintiff could perform light work with additional limitations, noting that Plaintiff's statements of intensity, persistence and functionally limiting effects of his symptoms were not substantiated by the medical evidence and evidence of Plaintiff's activities of daily living.  Tr. 97-99.

The ALJ gave significant weight to the opinion of Dr. Bancks because findings made by a state agency consultant regarding the nature and severity of a claimant's impairments must be treated as expert opinion evidence of a non-examining source, and because his findings were

---

[14] A claimant's noncompliance with prescribed treatment without a good reason may be used as a factor for discounting allegations of disability.  Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003).  *See also* 20 C.F.R. § 416.930(b).

consistent with the record as a whole.  Tr. 20.  Where the ALJ has properly discounted the opinion of an examining source, the ALJ may rely on the opinion of a non-examining source.  *See* Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991).

The Eleventh Circuit has explained:

> When evaluating the medical opinion evidence, the ALJ must give the opinion of a treating physician "substantial or considerable weight" unless there is good cause not to do so. We have nevertheless concluded that good cause exists for affording less weight to a treating physician's opinion when: "(1) [that] opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Moreover, the opinion of a treating physician may be entitled to less weight when the physician's assessment conflicts with the claimant's own reported daily activities.  If the ALJ chooses to assign less weight to a treating physician's opinion, however, he must clearly articulate his reasons for doing so.

Mijenes v. Comm'r of Soc. Sec., 687 F. App'x 842, 847 (11th Cir. 2017) (unpublished) (citations omitted).

The ALJ gave Dr. Martinko's 2015 opinions little weight.  This weight was appropriate considering Dr. Martinko's 2015 assessments did not indicate that Plaintiff could not work on a consistent basis—only that his pain levels can vary depending on the timing of his medication and could affect his abilities—a general statement that fails to identify what abilities might be affected.  The record does not indicate that Dr. Martinko

examined Plaintiff between September 2013 and May 2015 when he completed the medical source statement. Moreover, as the ALJ found, his opinions were not bolstered by the evidence and conflicted to some extent with evidence of Plaintiff's daily activities.

Plaintiff also contends that the ALJ failed to include any loss of work time on a regular basis due to Plaintiff's migraines. ECF No. 20 at 24. The ALJ did not find migraines to be a severe impairment. Dr. Martinko did not refer to Plaintiff's headaches in his 2015 medical source statement. Tr. 801-10. Dr. Bancks noted that the records showed occasional migraines. Tr. 98. Although Dr. Bancks found Plaintiff's migraines to be a severe impairment, Tr. 95, he concluded that impairment, along with lupus and affective disorders, did not prevent Plaintiff from light, unskilled work. Tr. 100. Moreover, in the November 25, 2014, records, Dr. Martinko referred to in his medical source statement, Dr. Elder noted that Plaintiff reported a "mild increase" in his headaches since running out of prescribed magnesium. Tr. 792. Plaintiff testified to weekly severe migraines, but the medical records do not bear out that frequency.

The medical records show that although Plaintiff has an extensive history of medical visits to keep track of and treat his lupus and seizures, his treatment has been primarily conservative—not the type expected for a

totally disabled individual—and generally provided a level of relief.  This provides additional support for the finding that his documented impairments are not as limiting as he has alleged.  *See, e.g.*, Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996); Dennie v. Colvin, No. 1:14cv235-MP/CAS, 2015 WL 7184704, *5 (N.D. Fla. Jul. 9, 2015), report and recommendation adopted by Dennie v. Colvin, 2015 WL 7185516 (N.D. Fla. Nov. 13, 2015). Plaintiff's account of his daily activity showed that Plaintiff cares for his own needs, does light housework, occasionally drives, and plays basketball weekly—activities also inconsistent with total disability.

Based on the totality of the medical record and Plaintiff's account of his daily living, and assuming reasonable compliance with medication, the ALJ's residual functional capacity finding, with the stated limitations, and the finding that Plaintiff was not disabled, were based on substantial evidence in the record.

## VI. Conclusion

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.  Accordingly, pursuant to 42 U.S.C § 405(g), it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's

applications for Supplemental Security Income benefits should be

**AFFIRMED.**

      **IN CHAMBERS** at Tallahassee, Florida, on November 9, 2017.


          **s/  Charles A. Stampelos**
          **CHARLES A. STAMPELOS**
          **UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

      **Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**